UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLOUDCLINIC LLC, | Case No.: 17-CV-1293-JLS (NLS) |
| Plaintiff, | **ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT** |
| v. | (ECF No. 17) |
| THERAPETIC SOLUTIONS, INC., et al., | |
| Defendants. | |

Presently before the Court is Plaintiff Cloudclinic LLC's Motion for Default Judgment against TheraPetic Solutions, Inc. and Richard Strauski, ("MTN," ECF No. 17). After considering Plaintiff's argument and the law, the Court rules as follows.

## BACKGROUND

Plaintiff filed a Complaint against Defendants TheraPetic Solutions, Inc. and Richard Strauski (hereinafter "Defendants") alleging Cybersquatting, Registered Mark Trademark Infringement, Unfair Competition and Common Law Trademark Infringement; and Unfair Competition pursuant to California Busness and Professional Code section

17200. ("Compl.," ECF No. 1.)[1]  Since January 2015, Plaintiff has operated "the website CertaPet.com, providing easy and discreet online access to mental health services for people living with an emotional or psychological disability." (*Id.* ¶ 10.)  The website connects patients with licensed mental health professionals, who may recommend to the patient an emotional support animal ("ESA"). (*Id.* ¶ 11.)  Plaintiff states its predecessor in interest used the trademark CERTAPET for the services and assigned the trademark to Plaintiff in July 2016. (*Id.* ¶ 12.)  The trademark is registered and covers "[m]arketing and administrative services for licensed mental health professionals; providing a web site that features an on-line market for users to purchase pet related goods; [and] on-line retail store services featuring pet related goods." (*Id.* ¶ 13); *see* U.S. Reg. No. 5,103,770.

Plaintiff alleges Defendants own and operate certapets.com and certapet.org (hereinafter, "the Accused Domains"). (Compl. ¶ 16.)  Plaintiff alleges Defendants display Plaintiff's CERTAPET mark on the Accused Domains. (*Id.* ¶ 19 (confirmed by a screenshot of Defendants' website).)  Plaintiff alleges this has resulted in consumer confusion and damages. (*Id.* ¶ 22.)  As a result, Plaintiff seeks

> both monetary damages and equitable relief in the form of: (1) transfer of the domain names CertaPets.com and Certapet.org . . . (2) an injunction barring Defendants from utilizing future websites employing the trademark CERTAPET, or any other confusingly similar trademark, (3) statutory damages up to $2,200,000, (4) up to treble TheraPetic's profits, and (5) $49,480.00 in attorney's fees and costs; or such other combined statutory damages, profits, fees and costs as to provide CloudClinic with the largest cumulative monetary relief. The monetary awards should be joint and several as to both Defendants.

(MTN 8).

Plaintiff has obtained an entry of default against both Defendants, (ECF Nos. 12, 16), and now brings a motion for default judgment. (*See generally* MTN.)  Upon request

---

[1] Plaintiff also filed the Complaint against Dierdre White, but dismissed this Defendant.  Plaintiff alleges TheraPetic is the registrant for the accused internet domains and that Strauski operates the websites and is listed with the Internet Corporation for Assigned Names and Numbers as the contact person for each domain name.  (Compl. ¶ 3.)

1  by the Court, Plaintiff has provided supplemental briefing as to whether the Court has

2  personal jurisdiction over Defendants.  (ECF No. 21.)

3  **LEGAL STANDARD**

4          Federal Rule of Civil Procedure 55 permits a court to enter default judgment after

5  entry of default. A court is to grant or deny default judgment at its discretion. *See Alan*

6  *Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988) (citing *Haw.*

7  *Carpenters' Trust Funds v. Stone*, 794 F.2d 508, 511–12 (9th Cir. 1986); *Eitel v. McCool*,

8  782 F.2d 1470, 1471 (9th Cir. 1986); *Aldabe v. Aldabe,* 616 F.2d 1089, 1092 (9th Cir.

9  1980)). The Ninth Circuit has set out seven factors for a court to consider when exercising

10  this discretion:

11           (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's
         substantive claim, (3) the sufficiency of the complaint, (4) the sum of money
12         at stake in the action, (5) the possibility of a dispute concerning material facts,
         (6) whether the default was due to excusable neglect, and (7) the strong policy
13         underlying the Federal Rules of Civil Procedure favoring decisions on the
         merits.
14

15  *Eitel*, 782 F.2d at 1471–72 (citation omitted).

16          "[U]pon default[,] the factual allegations of the complaint, except those relating to

17  the amount of damages, will be taken as true."  *Geddes v. United Fin. Grp.*, 559 F.2d 557,

18  560 (9th Cir. 1977) (citations omitted).   To prove damages, a plaintiff may submit

19  declarations or the Court may hold an evidentiary hearing.  *See Affinity Grp., Inc. v. Balser*

20  *Wealth Mgmt.*, No. 05cv1555 WQH (LSP), 2007 WL 1111239, at *1 (S.D. Cal. Apr. 10,

21  2007).

22  **ANALYSIS**

23  **I.    Procedural Matters**

24          Before turning to the merits, the Court must assess whether it has jurisdiction to enter

25  default judgment against Defendants.  Furthermore, the Court must determine whether

26

27

28

3

service of process in this matter was proper.[2]

### A.  Personal Jurisdiction

The Court must have personal jurisdiction over each of the Defendants before it may enter default judgment, or else entry of default judgment is void.  *See Bittorrent, Inc. v. Bittorrent Mktg. GMBH*, No. 12-CV-02525-BLF, 2014 WL 5773197, at *3 (N.D. Cal. Nov. 5, 2014) (citing *Veeck v. Commodity Enters., Inc.*, 487 F.2d 423, 426 (9th Cir. 1973)).  The burden is on the plaintiff to show that personal jurisdiction exists over each defendant.  *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).

The Ninth Circuit has established a three-prong test for analyzing a claim of specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  "Purposeful direction" and "purposeful availment" are two different concepts.  *Ziegler v. Indian River Cnty.*, 64 F.3d 470, 473 (9th Cir. 1995).  "A purposeful availment analysis is most often used in suits sounding in contract" and "typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there."  *Schwarzenegger*, 374 F.3d at 802.  "A purposeful direction analysis, on the other hand, is most often used in suits sounding in tort" and "usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere."  *Id*. at 802–03.  As Plaintiff here has alleged causes of action sounding in tort, the Court will perform a purposeful direction analysis.

---

[2] The Court finds it has federal question subject matter jurisdiction and supplemental jurisdiction over this case.

### 1. *Purposeful Direction of Activities*

"In tort cases, [the court] typically inquire[s] whether a defendant 'purposefully direct[s] his activities' at the forum state, applying an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc) (quoting *Schwarzenegger*, 374 F.3d at 803). This test, often referred to as the "effects" test, derives from *Calder v. Jones*, 465 U.S. 783 (1984). The defendant must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (citing *Calder*, 465 U.S. 783). All three parts of the test must be satisfied. *Schwarzenegger*, 374 F.3d at 805. However, the Ninth Circuit has warned courts not to focus too narrowly on the effects prong of this test, holding that "something more" is needed in addition to a mere foreseeable effect. *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000).

As to the requirement of an intentional act, the Court finds this element is met because Plaintiff has alleged Defendants acted intentionally in registering the Accused Domains, operating these domains, and using Plaintiff's CERTAPET mark. (Compl. ¶ 29.)

As to the express aiming requirement, in a case like this one, to find that a nonresident defendant expressly aimed his conduct at the forum, the Ninth Circuit requires "something more" than "simply registering someone else's trademark as a domain name and posting a web site on the Internet." *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998). In determining whether the non-resident defendant has done "something more," the Ninth Circuit has examined several factors, "including the interactivity of the defendant's website; the geographic scope of the defendant's commercial ambitions; and whether the defendant 'individually targeted' a plaintiff known to be a forum resident." *Mavrix Photo*, 647 F.3d at 1229 (citations omitted) (finding that when the nonresident defendant purposefully operated a website whose content infringed

5

the plaintiff's copyrights, the "something more" requirement was met because the website contained advertisements directed specifically at the forum whose audience was an "integral component" of the defendant's "business model and its profitability"); *see also Panavision*, 141 F.3d at 1322 (finding that when the nonresident defendant purposefully registered the plaintiff's marks as his domain names, the "something more" requirement was met because the purpose of the defendant's conduct was to extort money from the plaintiff); *Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1020 (9th Cir. 2002) (finding that when the nonresident defendant purposefully operated a website whose content infringed the plaintiff's trademarks, the "something more" requirement was met because the defendant ran a marketing campaign seeking to profit from an audience in the forum).

Most instructive to the present case is *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1130–31 (9th Cir. 2010), which held that the express aiming requirement of the *Calder* effects test was met when an out-of-forum defendant plagiarized the plaintiff's website and entered into direct competition with it, thereby confusing potential clients. *Brayton* involved a copyright dispute between two law firms, both attempting to practice in the field of elder abuse law. *Id*. at 1126–27. The plaintiff accused the defendant of copying portions of plaintiff's website related to elder abuse law for defendant's own site. *Id*. Defendant moved to dismiss for improper venue which the Court analyzed under the *Calder* effects test. *Id*. at 1128 (citing *Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284, 289 (9th Cir. 1997)). The court found that by copying plaintiff's website, defendant had specifically targeted plaintiff, and the forum in which it resided, by confusing potential clients and placing itself in direct competition with plaintiff. *Id.* at 1131. Thus, this copying constituted express aiming and satisfied the second requirement of the *Calder* effects test. *Id*.

Here, as in *Brayton*, Plaintiff argues that Defendants copied Plaintiff's trademark and logo with such specificity that it is clear Defendants expressly targeted Plaintiff's website in doing so. Plaintiff alleges that Defendants copied Plaintiff's "CERTAPET mark

1    (including the well-known accompanying paw in close proximity) on pictures prominently

2    plastered on [Defendants'] website." (Compl. ¶ 19.)   Indeed, the resemblance between

3    Plaintiff's logo and what Defendants allegedly used on the Accused Domains is striking.[3]

4    Both logos contain the word "CertaPet," both use a similar font, and both include a colorful

5    paw print with a heart shape located in the center of the paw. (*Id*.; MTN 10.)   The fact that

6    these logos are so similar, and that they appear/appeared on both Plaintiff's and

7    Defendants' websites, supports Plaintiff's contention that Defendants knowingly copied

8    the contents of Plaintiff's website for their own use.   Furthermore, just as in *Brayton*, by

9    copying portions of Plaintiff's website, it is plausible that Defendants have confused

10   potential customers and placed themselves in competition with Plaintiff.   (*See* Compl.

11   ¶ 22.)   Specifically, Plaintiff alleges that it "received verified complaints from consumers

12   alleging [Plaintiff] did not deliver the requested letters, however, when [Plaintiff] checked

13   the order numbers, [Plaintiff] discovered that the order numbers [did] not belong to

14   [Plaintiff] and the order numbers [belonged] to Defendants." (*Id*.)   Therefore, Plaintiff's

15   Complaint alleges facts sufficient to show that Defendants created a website that

16   specifically targeted a California company by copying both its name and logo, and placed

17   themselves in direct competition with that company.   Thus, "something more" than just an

18   infringing domain exists here to satisfy the express aiming requirement of the *Calder*

19   effects test.

20        Finally, as to the third requirement of the *Calder* effects test, it is clear that the brunt

21   of the harm to Plaintiff will be suffered in California.   As previously mentioned, Plaintiff

22   alleges that Defendants' websites have caused consumer confusion, thereby drawing

23   business away from Plaintiff, who operates in California. (*See id*.)   Furthermore, Plaintiff

24   alleges that Defendants' actions have "siphoned" Plaintiff's goodwill and brand image, and

25   damaged Plaintiff's reputation. (*Id*. ¶ 24.)   As Plaintiff is a California-based company, it

26

27   [3] Plaintiff states the Accused Domains have been taken down, (ECF No. 9-1, at 2), which the Court has

28   confirmed.  The Court relies on screenshots provided by Plaintiff showing use of the mark on the Accused Domains.

will undoubtedly suffer the brunt of this harm to its goodwill and reputation in California. Thus, the Court finds the third requirement of the *Calder* effects test has been met.

### 2. *Relatedness*

As to the second prong of the personal jurisdiction test, "[t]he Ninth Circuit adopted the 'but for' test to determine the 'arising out of' requirement. . . . The Ninth Circuit has recognized that, in trademark or copyright infringement actions, if the defendant's infringing conduct harms the plaintiff in the forum, this element is satisfied." *Fighter's Mkt., Inc. v. Champion Courage LLC*, 207 F. Supp. 3d 1145, 1155 (S.D. Cal. 2016) (citing *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 761 (9th Cir. 1990), and *Adobe Sys. Inc. v. Blue Source Grp., Inc.*, 125 F. Supp. 3d 945, 963 (N.D. Cal. 2015)).

Here, Plaintiff's claims arise out of Defendants' infringing websites which bear Plaintiffs' trademarks. As discussed above, it is alleged that Defendants' conduct has harmed Plaintiff in California by confusing potential customers and impinging on Plaintiff's goodwill and reputation. Accordingly, the Court finds that Defendants' infringing actions are related to Plaintiff's claims.

### 3. *Fair Play and Substantial Justice*

Plaintiff has met its burden on the first two prongs. Defendants have not responded to any of Plaintiff's allegations, much less its arguments here. And, the Court cannot discern how its exercise of jurisdiction over Defendants would be unfair or unjust. Personal jurisdiction is reasonable here because "Defendant interjected itself into California by targeting a California company." *See Bittorrent*, 2014 WL 5773197, at *7 (finding the same).

Accordingly, the Court finds that it has personal jurisdiction over Defendants.

### B.   *Service of Process*

"A federal court is without personal jurisdiction over a defendant unless the defendant has been served in accordance with Federal Rule of Civil Procedure 4." *Travelers Cas. & Sur. Co. of Am. v. Brenneke,* 551 F.3d 1132, 1135 (9th Cir. 2009). "Rule 4 is a flexible rule that should be liberally construed so long as a party receives sufficient

notice of the complaint." *UFCW, Locals 197 & 373 v. Alpha Beta Co.*, 736 F.2d 1371, 1382 (9th Cir. 1984). Pursuant to the Federal Rules of Civil Procedure, an individual or corporation "may be served at a place not within any judicial district of the United States . . . by other means not prohibited by international agreement, as the court orders." Fed. R. Civ. P. 4(f)(3) & (g). Service under Rule 4(f)(3) must be directed by the court, not prohibited by international agreement, and comport with constitutional notions of due process. *Rio Props., Inc.*, 284 F.3d at 1014–16. It is within the court's discretion "to craft alternate means of service." *Id.* at 1016.

Plaintiff here filed a waiver of service as to Defendant Therapetic Solutions, Inc. (ECF No. 7.) Federal Rule of Civil Procedure 4(d)(4) states that when a plaintiff "files a waiver, proof of service is not required and these rules apply as if a summons and complaint had been served at the time of filing the waiver." Thus, the Court finds that service was properly executed as to Defendant Therapetic Solutions, Inc.

As to Defendant Richard Strauski, Plaintiff has attempted service in two separate ways. (*See* ECF Nos. 8-1, 14-1.) First, Plaintiff mailed process to Defendant Strauski via United States first-class mail. (ECF No. 8-1.) Next, Plaintiff moved for an order authorizing service via email to Defendant Strauski's email address, rstrauski@gmail.com. (ECF No. 9.) Finding that other courts had previously granted similar motions, and that rstrauski@gmail.com was likely Defendant's email address because he had listed it as his email on all his domain name registrations, the Court granted Plaintiff's motion and authorized service by email. (ECF No. 13.) Plaintiff subsequently complied with the Court's order by sending the complaint and summons to Defendant Strauski's email address, and declaring that it "received no rejection, return, or other bounce-back message indicating the email was not delivered." (ECF No. 14-1 at 2). Between the service by both mail and email, the Court finds that Plaintiff's service of Defendant Strauski complies with Rule 4. The Court now proceeds to the merits of Plaintiff's Motion for Default Judgment.

/ / /

/ / /

9

## II.     Default Judgment

The Court examines the *Eitel* factors in exercising its discretion to award a default judgment.  *See* 782 F.2d at 1471–72.

### A.     *Possibility of Prejudice to Plaintiff*

*Eitel*'s first factor looks to whether a plaintiff would suffer prejudice if its motion were denied.  782 F.2d at 1471; *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).   Because Plaintiff "will likely be without other recourse for recovery" were this Court to deny their motion, this factor weighs in favor of default judgment.  *PepsiCo*, 238 F. Supp. 2d at 1177.

### B.     *The Merits of Plaintiff's Substantive Claims and the Sufficiency of the Complaint*

The second and third *Eitel* factors address the substantive merits of the claim and the sufficiency of the complaint.  782 F.2d at 1472; *Affinity Grp.*, 2007 WL 1111239, at *2. The Ninth Circuit has suggested that these factors require that a plaintiff "state a claim on which the [plaintiff] may recover."  *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978).  The Court will analyze each of Plaintiff's causes of action.

#### 1.     *Cybersquatting (Under 15 U.S.C. § 1125(d))*

The Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), was enacted in 1999 as an amendment to the Lanham Act.  The Act targets cybersquatting, which occurs

> when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder.

*Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005) (quoting *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 2014 (6th Cir. 2004)).  To prevail on an ACPA claim, a plaintiff must show "(1) registration of a domain name, (2) that was 'identical or confusingly similar to' a mark that was distinctive at the time of registration,

and (3) "bad faith intent" at the time of registration." *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1030 (9th Cir. 2011) (emphasis removed) (citing 15 U.S.C. § 1125(d)(1)).[4]

Plaintiff alleges it owns the exclusive use of the CERTAPET mark, a "valid, distinctive, and protectable trademark." (Compl. ¶ 26.) Plaintiff alleges its mark was distinctive "by virtue of extensive use and a deep pool of customers all across the United States has obtained market penetration in the entire United States." (*Id.* ¶ 28.) Plaintiff alleges Defendants purchased the domain names for the Accused Domains and that these domain names contain the exact CERTAPET mark. (*Id.* ¶ 31.) Plaintiffs allege "Defendants' registration and use was done in bad faith and with the intent to profit from the goodwill of CloudClinic's CERTAPET mark." (*Id.*) Plaintiffs allege bad faith for a variety of reasons, including because the CERTAPET mark is well-known, the Accused Domains do not offer any legitimate goods or services, and Defendants intend to divert customers from Plaintiff's website to the Accused Domains with the intent to harm Plaintiff's mark. (*Id.*)

Taking the allegations in the Complaint as true, Plaintiff has alleged a cause of action for cybersquatting against Defendant TheraPetic. Plaintiff has alleged Defendant TheraPetic is the registrant for two domain name confusingly similar to Plaintiff's registered, distinctive mark, and that the registration of the domain names was done in bad faith with an intent to profit from Plaintiff.

a. Defendant Strauski

In its Motion, Plaintiff in no way distinguishes between its request for default judgment against Defendant TheraPetic and Defendant Strauski. Plaintiff groups the two together, continually alleging "Defendants" engaged in infringement and cybersquatting and referring to the actions of "Defendants" generally.

---

[4] In determining whether a defendant has acted in bad faith within the meaning of § 1125(d)(1)(A), a court may consider, but is not limited to, the nine factors under § 1125(d)(1)(B). The listed criteria is not exhaustive and "the most important grounds for finding bad faith are the unique circumstances of the case." *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002).

1

2

3

4

5

6

7

 Broadly, Plaintiff alleges Mr. Strauski

registered and operates the websites certapets.com and certapet.org ("Accused Domains" or "Accused Websites"), and is listed with ICANN as the contact person at TheraPetic Solutions, Inc. for each domain name. He registered the accused domains, maintains their registrations, placed and maintains the content of the websites for the Accused Domains, and set up the use of Plaintiffs' [sic] trademarks on targeted Google Ads to confusingly direct consumers to the Accused Websites. On information and belief, Strauski is an owner and the CEO of Defendant TheraPetic Solutions., Inc.

8

(Compl. ¶ 3.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 In trademark infringement, personal liability can stem from either alter ego liability or direct participation in the tort. *See Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) (stating in a trademark infringement case, "[a] corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf" (internal quotation marks and citation omitted)); *see also Partners for Health & Home, L.P. v. Seung Wee Yang*, No. CV 09-07849 RZ, 2011 WL 5387075, at *4 (C.D. Cal. Oct. 28, 2011) (holding that "[a]n individual who personally directs a corporation in committing trademark infringement, or who personally commits those acts, is personally liable for that infringement" and that "[t]his is particularly true when a single individual is the corporation's sole shareholder, sole officer, and sole manager, and performs the infringing acts himself"—"[s]uch personal liability does not depend on piercing the corporate veil"); *Novell, Inc. v. Unicom Sales, Inc.*, No. C-03-2785 MMC, 2004 WL 1839117, at *17 (N.D. Cal. Aug. 17, 2004) (corporate officers are "personally liable for [a] corporation's copyright and trademark infringements when they are a 'moving, active conscious force' behind the corporation's infringement" (internal citation omitted)).

26

27

28

 Plaintiff has alleged Mr. Strauski is the CEO and owner of TheraPetic Solutions, thus making him a corporate officer who would be liable for all torts he authorizes or directs. Plaintiffs have alleged Mr. Strauski registered the Accused Domains and set up

Google Ads. (Compl. ¶ 3.) This is sufficient to allege he participated in the tort or at least was a moving force behind the alleged infringement. Taking Plaintiff's allegations as true, Plaintiff has pled trademark infringement against individual Defendant Strauski.

Accepting the allegations in the Complaint as true, the merits and sufficiency of the allegations favor entering default judgment on Plaintiff's claim for cybersquatting against both Defendants.

### 2. Registered Mark Trademark Infringement (Under 15 U.S.C. § 1114(1))

To prevail on a claim of trademark infringement, a plaintiff must demonstrate that it "owns a valid mark, and thus a protectable interest" and that the defendant's "use of the mark 'is likely to cause confusion, or to cause mistake, or to deceive.'" *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1196 (9th Cir. 2009) (quoting *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005); *see* 15 U.S.C. § 1114(1)(a) & (b).

Here, Plaintiff has properly alleged it owns a valid mark because it has provided evidence the CERTAPET Mark is federally registered by the United States Patent and Trademark Office. (Compl. ¶ 42); *see also* 15 U.S.C. § 1115(a) (registration on principal register is prima facie evidence of validity, ownership, and exclusive right to use registered mark).

Plaintiff has also sufficiently demonstrated Defendants' use of its mark is likely to cause confusion. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979) (identifying eight factors for likelihood of confusion: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines). "In cases involving counterfeit marks, it is unnecessary to perform the step-by-step examination [of the *Sleekcraft* likelihood of confusion test] . . . because counterfeit marks are inherently confusing." *Philip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004); *see also Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,

286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("[C]ounterfeits by their very nature, cause confusion.").

Plaintiff has attached a screenshot of one of the Accused Domains which displays Plaintiff's trademark.   (Compl. ¶ 19).[5]   Plaintiff alleges that Defendants have used Plaintiff's mark directly.   Plaintiff's allegations suffice to establish that Defendants are using counterfeit marks; as a result, it is unnecessary to analyze the likelihood of confusion factors.   Accepting the allegations in the Complaint as true, the merits and sufficiency of the allegations favor entering default judgment on Plaintiff's claim for trademark infringement in violation of 15 U.S.C. § 1114.

### 3.   Unfair Competition and Common Law Trademark Infringement (15 U.S.C. § 1125(a))

Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), provides a cause of action for anyone injured by unfair competition.   "The 'ultimate test' for unfair competition is exactly the same as for trademark infringement: 'whether the public is likely to be deceived or confused by the similarity of the marks.'" *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988) (quoting *New W. Corp. v. NYM Co. of Cal.*, 595 F.2d 1194, 1201 (9th Cir. 1979).  Because Plaintiff has established Defendant's liability for trademark infringement, the merits and sufficiency of the allegations likewise favor entering default judgment on Plaintiff's claim for unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a).

### 4.   Unfair Competition (California Business and Professions Code § 17200)

The Ninth Circuit has "consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994). As with federal unfair competition claims under

---

[5] The other Accused Domain, certapets.com, "simply redirects" the user to Defendants' other website, certapet.org.  (Compl. ¶ 30.)

the Lanham Act, the "ultimate test" of state law unfair competition is the likelihood of public confusion. *Id.* (citing *Century 21 Real Estate Corp.*, 846 F.2d at 1178). Thus, the merits and sufficiency of Plaintiff's allegations also weigh in favor of entering default judgment on Plaintiff's claim for state law unfair competition in violation of California Business and Professions Code § 17200.

In sum, the second and third *Eitel* factors weigh in favor of grating default judgment.

### C. The Sum of Money at Stake in the Action

The fourth *Eitel* factor examines the amount of money at issue. 782 F.2d at 1471. "[T]he court must consider the amount of money at stake in relation to the seriousness of Defendant[s]' conduct." *PepsiCo*, 238 F. Supp. 2d at 1176–77. "The Court considers Plaintiff's declarations, calculations, and other documentation of damages in determining if the amount at stake is reasonable. Default judgment is disfavored when a large amount of money is involved or unreasonable in light of the potential loss caused by the defendant's actions." *HICA Educ. Loan Corp. v. Warne*, No. 11-CV-04287-LHK, 2012 WL 1156402, at *3 (N.D. Cal. Apr. 6, 2012) (citations and internal quotation marks omitted).

Here, Plaintiff seeks: "$2 million in statutory damages, $1,529,728 in Defendants' treble profits, and attorneys' fees and costs of $49,480.00, or such other combination that maximizes the total amount of relief the court finds warranted." (MTN 27.) $2,000,000 is sought for the trademark infringement. This amount is the maximum statutory damages for trademark infringement. (*Id.* at 19.) $1,529,728 is sought for cybersquatting and is calculated by Plaintiff as Defendants' profits from the Accused Domains. Plaintiff estimates that Defendants' profits were likely $529,728 in sales, and Plaintiff then requests the profits be trebled under 15 U.S.C. § 1117. (*Id.* at 22–23.) Plaintiff also requests attorney's fees and costs because it argues this is an "exceptional case" under 15 U.S.C. § 1117(a).

Given that Plaintiff seeks the maximum damages, and there is a substantial amount of money at stake in this case, this factor weighs against the entry of default judgment. / / /

### D. The Possibility of a Dispute Concerning Material Facts

The fifth *Eitel* factor examines the likelihood that the material facts in the complaint are disputed.  782 F.2d at 1471–72.  "Upon entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to damages."  *PepsiCo*, 238 F. Supp. 2d at 1177 (citing *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987)).  Because Defendant has not answered, there is unlikely to be a dispute of material facts in this case.

### E. Possibility of Excusable Neglect

The sixth *Eitel* factor examines the likelihood that a defendant's default is the result of excusable neglect.  782 F.2d at 1472.  In this case, Defendant Therapeutic filed a waiver of service and then failed to engage in this litigation.  (*See* ECF No. 7.)  Plaintiff states it engaged in discussions with Defendants' counsel and Defendants then "elected to make a strategic default."  ("Wagner Decl.," ECF No. 17-4, ¶ 4.)  The waiver by Therapeutic was filed by Ciara Ryan, Esq., an attorney at One LLP.  (*Id.*)  Plaintiff's subsequent filings were then served on Ms. Ryan by mail and email.  (*See e.g.*, ECF No. 10, at 3; ECF No. 15, at 4 (Request for Clerk to Enter Default served by mail).)  Given that Defendant was served with multiple documents throughout this action <u>after it filed a waiver of service</u>, the default is unlikely accidental or a result of neglect.  Thus, this factor weighs in favor of granting default.

### F. Policy Favoring Decisions on the Merits

The seventh *Eitel* factor concerns "the general rule that default judgments are ordinarily disfavored." 782 F.2d at 1472. "While the public policy favoring disposition of cases on their merits weighs against default judgment, that single factor is not enough to preclude imposition of this sanction" on its own.  *Rio Props., Inc.*, 284 F.3d at 1022. "Moreover, [a] Defendant's failure to answer Plaintiffs' Complaint makes a decision on the merits impractical, if not impossible." *PepsiCo*, 238 F. Supp. 2d at 1177.  Thus, while this factor weighs against default, this Court is not precluded from entering default judgment in this action.

16

Based on the foregoing analysis, the Court finds that the *Eitel* factors in favor of granting default judgment outweigh the strong public policy favoring decisions on the merits.  The Court **GRANTS** Plaintiff's Motion for Default Judgment on Plaintiff's claims for (1) cybersquatting; (2) registered mark trademark infringement; (3) unfair competition and common law trademark infringement; and (4) unfair competition.

## III.   Remedies

Plaintiff seeks: a transfer of the Accused Domains; an injunction; damages; and attorney's fees and costs.  As to damages, Plaintiff seeks damages of $3,584,184. Plaintiff recognizes that it cannot seek both statutory damages and actual damages but seeks the "highest combined cumulative damages for both claims" thus seeking statutory damages for its trademark infringement claim ($2,000,000) and actual damages for its cybersquatting claim ($1,584,184).  (MTN 27.)  In assessing remedies, the Court does not take the allegations in the Complaint as true and will examine the evidence offered by Plaintiff in support of each form of requested relief.  *Televideo*, 826 F.2d at 917–18.

### A. *Transfer of Certapet.org and Certapets.com*

On a cybersquatting claim under the ACPA, the remedies include ordering "the transfer of the domain name to the owner of the mark."  15 U.S.C. 1125(d)(1)(C).  Plaintiff requests the Court order the transfer of the Accused Domains.  The Court finds this request to be reasonable and necessary.  The domain names certapet.org and certapets.com shall be transferred to Plaintiff.

### B. *Injunctive Relief*

Plaintiff requests the Court enter a bar on further registrations by Defendants including "certa" and "pet" and a bar on future trademark infringement.  (MTN 15–16.) The Lanham Act gives the Court "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation" under the Lanham Act. 15 U.S.C. § 1116(a).

To obtain a permanent injunction, a plaintiff must demonstrate: "(1) that it has

suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

As to the first factor, "[o]nce the plaintiff has demonstrated a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted." *Metro Publ'g Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir. 1993). The Court found that Plaintiff has demonstrated a likelihood of confusion because Defendants are using Plaintiff's exact mark; thus, irreparable harm is shown. As to the second factor, "[i]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Health Net v. U.S.A. Healthnet, Inc.*, No. CV 92–03825 KN, 1993 WL 209564, at *7 (C.D. Cal. Jan. 13, 1993) (quoting *Century 21 Real Estate Corp.,* 846 F.2d at 1180). As to the third factor, Defendants "face no hardship in being enjoined from conducting illegal activities while, in the absence of an injunction, Plaintiff faces loss of sales and damage to its reputation." *Rolex Watch U.S.A., Inc. v. Watch Empire LLC*, CV 13-09221-SJO (FFMx), 2015 WL 9690322, at *8 (C.D. Cal. Sept. 29, 2015). And, as to the fourth factor, the public interest is served in protecting trademark rights and in not being confused by an infringer. All factors weigh in favor of an injunction. The Court finds that the proposed injunctive relief is appropriate and necessary.

### C. Damages for Cybersquatting Claim

As noted above, Plaintiff seeks actual damages for its cybersquatting claim. Under 15 U.S.C. § 1117(d), "[i]n a case involving a violation of section 1125(d)(1)," the plaintiff may elect statutory damages instead of actual damages and profits and seek "an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." Here, Plaintiff seeks actual damages, or, in the alternative, $100,000 per domain name in statutory damages.

18

1

###### 1.  Actual Damages

2        A plaintiff may elect between "one of two alternative recovery options for the use

3 of counterfeit marks:  (1) the actual damages caused by the infringement, or (2) statutory

4 damages."  *UL LLC v. Space Chariot Inc.*, 250 F. Supp. 3d 596, 612 (C.D. Cal. 2017)

5 (citing 15 U.S.C. § 1117(c)).

6         "Several courts have found statutory damages are appropriate in default judgment

7 cases because the information needed to prove actual damages is within the infringers'

8 control and is not disclosed."  *Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874, 882 (S.D.

9 Ohio 2007) (citing cases).   Indeed, there is no evidence here of Defendants' profits,

10 Plaintiff has provided its estimate.  To recover damages under the Lanham Act, a plaintiff

11 "must prove both the fact and the amount of damage."  *Lindy Pen Co. v. Bic Pen Corp.*,

12 982 F.2d 1400, 1407 (9th Cir. 1993), *abrogated by SunEarth, Inc. v. Sun Earth Solar Power*

13 *Co.*, 839 F.3d 1179 (9th Cir. 2016) (en banc) (per curiam).

14        A plaintiff may establish the amount of damages by showing the profits it "would

15 have earned but for the infringement" or by showing the defendant's unjust enrichment in

16 the form of profits attributable to the infringing activity.  *Id.*  "As a general rule, damages

17 which result from a tort must be established with reasonable certainty. . . . '[D]amages are

18 not rendered uncertain because they cannot be calculated with absolute exactness,' yet a

19 reasonable basis for computation must exist."  *Id.* at 1408–09 (quoting *Eastman Kodak Co.*

20 *v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927)).

21        Plaintiff seeks damages based on Defendants' estimated profits.  Plaintiff estimates

22 that the Accused Domains "inferentially obtained at least 13 percent of the click-throughs

23 from people conducting Google searches specifically for Plaintiff's trademark 'certapet.'"

24 (MTN 21.)   Plaintiff states when one searched "Certapet" during the relevant period,

25 Defendants' website was "the <u>second</u> organic Google search result."  (*Id.*)  Plaintiff has

26 provided an estimate of "the sales it lost as Defendants' total profits from April 2017 [when

27 Defendants began running ads for the term 'certapet'] to June 2017 [when the domains

28 were shut down]."  (*Id.*)  Plaintiff states during this period, its own site traffic from its

Google Ads generated approximately 5,952 conversions (an approximately 13% conversion rate)." ("Riviera Decl.," ECF No. 17-2, at ¶ 8.)[6]  Plaintiff states "based on Defendants having the same number of converted sales through Google searches of the word 'certapet' as [Plaintiff], Defendants approximately received 5,952 improper sales at $89 each,[7] which comes to $529,728." (*Id.* ¶ 10.)  This is "[e]stimating that Defendants' number of customers and conversion rate were at least the same as [Plaintiff's]."  (MTN 22.)  Plaintiff then requests these damages of $529,728 are trebled.  Under 15 U.S.C. § 1117(b), a court is to award treble profits (i.e., judgment for three times profits of damages), if the violation consists of "intentionally using the mark," knowing the mark is a counterfeit mark, in connection with the sale or distribution of goods or services.

The Court is not convinced that Plaintiff has provided a "reasonable basis for computation" of its lost profits. *Lindy*, 982 F.2d at 1407.  Plaintiff's estimation of Defendants' profits is a calculated approximation based on an assumption that the Accused Domains had the same number of customers and conversation rate as Plaintiff's site. Plaintiff has not explained why this same estimation applies to a website of which Plaintiff has no firsthand knowledge.  The Court finds this is insufficient to prove the amount of damages. *See Hellbush v. Lane*, No. SACV 13-1973-JLS (DFMx), 2014 WL 12577141, at *1 (C.D. Cal. Apr. 7, 2014) (finding the plaintiff "has not sufficiently demonstrated that her total revenue represents a reasonable computation of Defendant's revenue bearing a legally sufficient relationship to the infringement" when she estimated damages "by calculating her own total revenue" from her own website for the infringement period). Plaintiff's request for damages in the amount of $1,589,184 for its cybersquatting claim is therefore **DENIED**.  The Court now analyzes statutory damages for the cybersquatting claim.

---

[6] A conversion rate means "for every 100 visitors that came from a Google search to certapet.com, 13 ordered an emotional support animal letter" from Plaintiff.  ("Riviera Decl.," ECF No. 17-2, at ¶ 7.)
[7] Plaintiffs state Defendants advertised they charged $89 for their service.  (Riviera Decl. ¶ 5).  This is confirmed by a screenshot of an advertisement by Defendants advertising an "$89 Instant Support Dog Letter."  (ECF No. 13-3, at 2.)

### 2. *Statutory Damages*

In considering how much to award under Section 1117(d), courts generally consider a number of factors, including the willfulness of the defendant's cybersquatting, the defendant's status as a serial cybersquatter, and other behavior by the defendant evidencing an attitude of contempt towards the court or the proceedings. *eAdGear, Inc. v. Liu*, No. CV-11-05398 JCS, 2012 WL 2367805, at *18 (N.D. Cal. June 21, 2012), *report and recommendation adopted*, No. C-11-05398 RMW JCS, 2012 WL 4005454 (N.D. Cal. Sept. 11, 2012). A "serial" cyberquatter has been defined as "one who has engaged in a pattern of registering and using a multitude of domain names that infringe the rights of other parties—and other behavior by the defendant evidencing an attitude of contempt towards the court of the proceedings." *Verizon Cal., Inc. v. OnlineNIC, Inc.* No. C 08–2832 JF (RS), 2009 WL 2706393, at *3 (N.D. Cal. Aug. 25, 2009).

"Where 'statutory damages are elected, [t]he court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima.'" *UL LLC*, 250 F. Supp. 3d at 614 (quoting *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990)). Here, after considering the facts alleged and the law, the Court is not inclined to apply the maximum statutory penalty. The Court does not find Defendants to be serial cybersquatters. In contrast to other courts who have found evidence of serial cybersquatting when the defendant registered an appalling number of infringing domain names, here, Defendants only registered two names, and there is no evidence Defendants showed any cybersquatting behavior to any entity besides Plaintiff. *Contra Pinterest, Inc. v. Qian Jin*, No. C 12-04586 RS, 2013 WL 5460821, at *3 (N.D. Cal. Sept. 30, 2013) (finding defendant was a serial cybersquatter when it registered 100 domain names); *Verizon Cal.*, 2009 WL 5352022, at *2 (awarding $50,000 per infringing domain name when the defendant created 663 domain names similar to plaintiff's marks). The Court also notes that Defendants shut down the Accused Domains in June 2017 when Plaintiff filed this lawsuit. (MTN 21.) This weighs against the imposition of maximum damages. *Contra Coach Servs., Inc. v. YNM, Inc.*, No. 2:10-

CV-2326-JST (PLAx), 2011 WL 1752091, at *5 (C.D. Cal. May 6, 2011) (finding willfulness based in part on defendants' continued infringement eight months after plaintiff filed the lawsuit). But, Defendants' failure to appear in this matter demonstrates willfulness. *See eAdGear*, 2012 WL 2367805, at *19 (finding the same).[8] Based on a consideration of all factors, the Court determines it will use its discretion to award Plaintiff $25,000 per domain name for Defendants' cybersquatting (for a total of $50,000).

### 3. *Trademark Infringement Damages*

For its trademark infringement claim, Plaintiff seeks statutory damages pursuant to 15 U.S.C. § 1117(c), which provides that "the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits . . ., an award of statutory damages." The statute provides that a plaintiff seeking statutory damages in a trademark infringement case may be awarded "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(1). Where the use of the counterfeit mark was willful, a plaintiff may receive "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(2).[9]

The Court finds that Plaintiff is entitled to statutory damages under Section 1117(c), and more specifically to damages for willful counterfeiting under Section 117(c)(2). In assessing the appropriate amount of damages under 15 U.S.C. § 1117(c), courts consider

---

[8] "Courts have inferred willful violation from a defendant's failure to comply with the judicial process or to participate in any way in the litigation at issue." *Belks Media v. OnlineNIC*, No. C09-00198 HRL, 2010 WL 7786122, at *5 (N.D. Cal. Aug. 23, 2010), *report and recommendation adopted*, No. C 09-00198 SBA, 2011 WL 5038576 (N.D. Cal. Oct. 24, 2011); *see also Microsoft Corp. v. Marturano*, No. 1:06cv1747 OWW GSA, 2009 WL 1530040, at *6 (E.D. Cal. May 27, 2009) (citing *Philip Morris USA*, 219 F.R.D. at 500; and *Tiffany (NJ) Inc. v. Luban*, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003)).

[9] A "counterfeit" is a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127; *see Gucci Am., Inc. v. Pieta*, No. CV 04–9626 ABC (MCx), 2006 WL 4725706, *3 (C.D. Cal. Jan. 23, 2006) ("A trademark is counterfeited if the defendant, without authorization from the trademark owner, uses an original mark or a copy of a mark in connection with the sale of goods" (citing *H–D Michigan, Inc. v. Biker's Dream, Inc.*, No. CV 97–864 SVW (CWx), 1998 WL 697898, at *1 (C.D. Cal. July 28, 1998))).

22

similar factors as in § 1117(d), including: defendant's willfulness in committing the violation, deterring future violations, and defendant's status as a serial cybersquatter. *Pinterest, Inc.*, 2013 WL 5460821, at *3.

As noted above, the Court does not find Defendants to be serial cybersquatters, but finds that their lack of defense in this matter shows willfulness. Defendants operated the website for about one year and ran ads for only one month, so their actions cannot be deemed continuous. *Contra Pinterest, Inc.*, 2013 WL 5460821, at *3 (noting that courts have awarded 50–60% of statutory damages where the defendant acted "willfully and continuously"). The Court also notes that other courts often award damages per infringed mark and here, Plaintiff only alleges the infringement of one mark. The Court declines to award maximum damages after analyzing these factors. The Court awards Plaintiff $50,000 in statutory damages for its claim of trademark infringement.

### 4. *Attorney's Fees and Costs*

Where trademark infringement or counterfeiting is willful, a case is an "exceptional case," and attorney's fees should be awarded. 15 U.S.C. § 1117(a). "A trademark infringement is viewed as exceptional under § 1117(a) 'when the infringement is malicious, fraudulent, deliberate or willful.'" *Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 711 (9th Cir. 1999) (quoting *Lindy Pen Co.*, 982 F.2d at 1409). "However, the plain language of the statute allows the court to choose whether to award fees, even after finding the case exceptional. The fact that 'in exceptional cases' precedes 'may' means that the case must be exceptional for attorneys'[ ] fees to be awarded, but in an exceptional case, the district court 'may' (or may not) award fees." *Fifty–Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1079 (9th Cir. 2015).

As noted above, Defendant's copying was deliberate and willful. Defendants created two near-identical domain names and used Plaintiff's identical mark. Defendants failed to prosecute this action and have shown no evidence that the copying was accidental. The Court finds that reasonable attorney's fees and costs are appropriate in this case.

/ / /

### 1. Fees

To determine whether the fees sought are reasonable under federal law, the court must first calculate the "lodestar figure" by multiplying "the number of hours reasonably expended on the litigation . . . by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The court determines a reasonable hourly rate by looking to the prevailing market rate in the community for comparable services. *See Bell v. Clackamas Cnty.*, 341 F.3d 858, 868 (9th Cir. 2003); *Jordan v. Multnomah Cnty.*, 815 F.2d 1258, 1263 (9th Cir. 1987). The party requesting fees bears the burden of adducing "satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984); *Jordan*, 815 F.2d at 1263.

Here, Plaintiff requests $49,080 in attorney's fees. Attorney Ben Wagner, billing at a rate of $636/hour, states he billed $25,400 on this matter. (Wagner Decl. ¶ 4.) He also states attorney Amanda Muskat, billing at a rate of $370/hour, billed $23,680 on this matter. (*Id.* ¶ 6.)

As to the hourly rates, Plaintiff cites to other cases and authority in this district where similar hourly rates have been deemed reasonable for attorneys with similar experience. (MTN 24.) The Court determines the hourly rates of Mr. Wagner and Ms. Muskat are reasonable. As to the hours incurred, Plaintiff states the invoices sent to the client were "carefully scrutinized for unjustified hours." (*Id.*) Plaintiff also lists the work that went into this case, including preparing the Complaint, serving Defendant Strauski and preparing the motion for electronic service, pre-default discussions with Defendant, and the preparation of the default judgment papers. (*Id.* at 24–25.) Plaintiff has not included any invoices which detail the hours spent on this matter. By the Court's calculations, Mr. Wagner billed approximately 40 hours on this matter and Ms. Muskat billed 64 hours on this matter. In determining a reasonable number of hours, the court reviews records to determine whether the hours claimed by the applicant are adequately documented and whether any of the hours claimed by the applicant were unnecessary, duplicative, or

excessive.  *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986), *reh'g denied, amended on other grounds*, 808 F.2d 1373 (9th Cir. 1987).  Plaintiff has provided no records that would allow the Court to determine whether the hours claimed are reasonable.  However, the Court determines that billing a total of 104 hours on this matter is reasonable.  The Court awards $49,080 in attorney's fees.

### 2.  Costs

As to costs, Plaintiff requests $400 for filing fees.  The Court finds these costs reasonable and awards $400 in costs.

### CONCLUSION

In sum, the Court:

1.  **GRANTS** Plaintiff's Motion for Default Judgment, (ECF No. 17);

2.  **GRANTS** Plaintiff's request for an injunction.  Defendants and each of their respective employees, agents, partners, officers, directors, owners, shareholders, principals, subsidiaries, related companies, affiliates, distributors, dealers, alter-egos, and all persons in active concert or participation with any of them are **HEREBY ENJOINED** from further use of Plaintiff's mark CERTAPET or any confusingly similar term, phrase or domain name, including those using the word "certa" or the word "pet";

3.  **GRANTS** Plaintiff's request that Defendants transfer to Plaintiff the domain names certapet.org and certapets.com;

4.  **ENTERS** Judgment in favor of Plaintiff against Defendants Richard Strauski and TheraPetic Solutions, Inc.;

5.  **AWARDS** Plaintiff damages in the amount of $100,000;

6.  **AWARDS** Plaintiff reasonable attorney's fees in the amount of $49,080;

7.  **AWARDS** Plaintiff costs in the amount of $400;

8.  Defendants' liability for the total amount is joint and several;

/ / /

/ / /

9.  The Clerk of Court is instructed to enter judgment accordingly and close the file.

   **IT IS SO ORDERED.**

Dated:  May 21, 2018

Hon. Janis L. Sammartino
United States District Judge

17-CV-1293-JLS (NLS)